# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | CLASS ACTION COMPLAINT |
| WEST CORPORATION, THOMAS B. BARKER, LEE ADREAN, DONALD M. CASEY, JR., ANTHONY J. DINOVI, PAUL R. GARCIA, LAURA A. GRATTAN, JEANETTE A. HORAN, MICHAEL A. HUBER, DIANE E. OFFEREINS, and GREGORY T. SLOMA, | ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) ) | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of West Corporation ("West" or the "Company") against West and the members of West's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of their attempt to sell the Company to Mount Olympus Holdings, Inc. ("Parent") through its wholly-owned subsidiary Olympus Merger Sub, Inc. ("Sub") (the "Proposed Transaction").  Parent and Sub are

affiliates of certain funds managed by affiliates of Apollo Global Management, LLC (together with Parent and Sub, "Apollo").

2.      On May 9, 2017, West issued a press release announcing it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with Apollo.  Under the terms of the Merger Agreement, Apollo will acquire all of the outstanding shares of West for $23.50 per share in cash (the "Merger Consideration").  The Proposed Transaction is valued at approximately $5.1 billion.

3.      On June 27, 2017, West filed a Definitive Proxy Statement on Schedule 14A (the "Proxy") with the SEC.  The Proxy, which recommends that West stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) West's financial projections, relied upon by West's financial advisor, Centerview Partners LLC ("Centerview"); (ii) the valuation analyses prepared by Centerview in connection with the rendering of its fairness opinion; and (iii) the background of the Proposed Transaction, including potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as West stockholders need such information in order to cast a fully-informed vote or make an appraisal decision in connection with the Proposed Transaction.

4.      In short, the Proposed Transaction is designed to unlawfully divest West's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

8.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.   West is incorporated in Delaware and headquartered in this District.   Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

10.      Plaintiff is, and has been at all relevant times, a continuous stockholder of West.

11.      West is a Delaware corporation, with its principal executive offices located at 11808 Miracle Hills Drive, Omaha, Nebraska 68154.   West's common stock is traded on the NASDAQ under the ticker symbol "WSTC."

12.      Defendant Thomas B. Barker ("Barker") has been President and Chief Executive Officer ("CEO") of the Company since September 1998 and Chairman of the Board since March 2008.   Defendant Barker has served in various executive roles since joining the Company in 1991.

13.     Defendant Lee Adrean ("Adrean") has been a director of the Company since March 2014.

14.     Defendant Donald M. Casey, Jr. ("Casey") has been a director of the Company since December 2015.

15.     Defendant Anthony J. DiNovi ("DiNovi") has been a director of the Company since 2006 and previously served as Chairman of the Board from October 2006 until March 2008.

16.     Defendant Paul R. Garcia ("Garcia") has been a director of the Company since March 2013.

17.     Defendant Laura A. Grattan ("Grattan") has been a director of the Company since October 2012.  Defendant Grattan is a managing director at Thomas H. Lee Partners, L.P. ("THL").

18.     Defendant Jeanette A. Horan ("Horan") has been a director of the Company since April 2016.

19.     Defendant Michael A. Huber ("Huber") has been a director of the Company since January 2014.  Defendant Huber is President and Managing Principal at Quadrangle Group LLC ("Quadrangle").

20.     Defendant Diane E. Offereins ("Offereins") has been a director of the Company since July 2015.

21.     Defendant Gregory T. Sloma ("Sloma") has been a director of the Company since March 2013.

22.     Defendants Barker, Adrean, Casey, DiNovi, Garcia, Grattan, Horan, Huber, Offereins, and Sloma are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

4

21.     Apollo Global Management LLC is a global alternative investment manager organized in the state of Delaware.

22.     Parent is a Delaware corporation and an affiliate of certain funds managed by affiliates of Apollo Global Management, LLC.

23.     Sub is a Delaware corporation, wholly-owned subsidiary of Parent, and an affiliate of certain funds managed by affiliates of Apollo Global Management, LLC.

24.     THL is a private-equity firm based in Boston and the Company's largest stockholder, owning approximately 21.5% of West's outstanding shares.

25.     Quadrangle is a private-equity and hedge-fund firm based in New York which owns approximately 4.5% of the Company's outstanding shares.

<u>**CLASS ACTION ALLEGATIONS**</u>

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own West common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of June 26, 2017, there were 85,154,029 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by West or its transfer agent and

may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

28.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

29.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

## Company Background

32.      West is a global provider of communication and network infrastructure services through a diverse portfolio of solutions that include unified communications services, safety

6

services, interactive services such as automated notifications, specialized agent services, and telecom services.  The Company's clients include Fortune 1000 companies, as well as small and medium enterprises in a variety of industries, with sales and/or operations in the United States, Canada, Europe, the Middle East, Asia-Pacific, Latin America and South America.

33.     Since its founding in 1986, West has expanded its technology platforms, evolving from labor-intensive communication services to predominantly diversified technology-driven services.  The Company has invested approximately $3.0 billion in strategic acquisitions, significantly expanding its Safety Services and Interactive Services business lines.  On March 7, 2017, West announced it had completed the acquisition of the cloud collaboration practice and assets from Vocus Group in Australia.  Commenting on the acquisition, President of West's Unified Communications Services segment, Scott Etzler, stated:

> We are excited to have acquired Vocus' cloud collaboration practice, which will expand our position and capabilities throughout the Asia-Pacific region. With this local infrastructure, West will be one of the few global providers of Cisco's hosted Unified Communications stack . . . This acquisition is expected to generate new opportunities for West in APAC, improve our competitive positioning and enhance global support & cost structure in our UCaaS business. The existing facilities in Perth and Melbourne, Australia will continue operations with fully-dedicated and experienced personnel driving business development and support of current clients. Throughout this transition, West will continue to meet our clients' expectations and provide the level of service they have come to expect.

34.     Additionally, on December 12, 2016, the Company announced it acquired 911 ETC, Inc., a leading provider of E9-1-1 services for the enterprise.  According to the press release, "West plans to integrate 911 ETC into its existing Enterprise solutions group in the Company's Safety Services operating segment," further expanding and improving upon the Company's services.

**The Sale Process**

7

35.     In September 2015, a strategic party referred to in the Proxy as "Party A" contacted defendant Barker and David Treinen ("Treinen"), West's Executive Vice President, Corporate Development and Planning, to express Party A's interest in potentially acquiring the Company's Safety Services segment.  West and Party A entered into a confidentiality and standstill agreement in October 2015.  The Proxy fails to disclose whether the standstill agreement is still in effect and operates to preclude Party A from submitting a topping bid for the Company.

36.     In late November 2015, a financial sponsor referred to in the Proxy as "Party B" contacted THL regarding the potential combination of West's Unified Communications Services segment with a portfolio company of Party B, referred to in the Proxy as "Party C."

37.     On January 20, 2016, Party A submitted a preliminary indication of interest regarding a potential acquisition of West's Safety Services segment, excluding its 911 Enable business.  The Proxy fails to disclose any terms of Party A's indication of interest.

38.     Following a January 28, 2016 meeting, the Board determined that Party A's proposal was inadequate.

39.     In April 2016, West and Party B entered into a confidentiality and standstill agreement to explore a potential combination of West's Unified Communications Services segment with Party C.  The Proxy fails to disclose whether the standstill agreement is still in effect and operates to preclude Party B or Party C from submitting a topping bid for the Company.

40.     In June 2016, a strategic party referred to in the Proxy as "Party D" contacted defendant Barker and Treinen to indicate Party D's interest in a possible business combination involving the Company's Unified Communications Services segment or all of the Company.  West and Party D subsequently entered into a confidentiality agreement.  The Proxy fails to disclose

whether the confidentiality agreement includes a standstill provision that operates to preclude Party D from submitting a competing bid for the Company.

41.     In August 2016, a financial sponsor referred to in the Proxy as "Party E" contacted defendant Barker and Treinen to indicate Party E's interest in exploring a business combination involving some or all of the Company.  West and Party E entered into a confidentiality and standstill agreement on September 27, 2016.  The Proxy fails to disclose whether the standstill agreement is still in effect and operates to preclude Party E from submitting a topping bid for the Company.

42.     Following a November 15, 2016 Board meeting and at the Board's direction, Centerview began contacting parties that might be interested in acquiring the Company or one or more of its segments.  West provided potentially-interested parties with confidentiality agreements.

43.     On December 16, 2016, Party B submitted a written indication of interest proposing that West acquire Party C for an undetermined amount of cash and stock.

44.     On December 20 and December 21, 2016, the Company received three preliminary indications of interest regarding a potential whole-company acquisition.  Apollo's proposal contemplated a price in the range of $26.00 to $30.00 per share.  A financial sponsor referred to in the Proxy as "Party F" submitted a proposal in the range of $26.50 to $28.50 per share and required that it be allowed to partner with another financial sponsor referred to in the Proxy as "Party I."  A financial sponsor referred to in the Proxy as "Party H" submitted a proposal in the range of $25.00 to $26.00 per share.  West also received five preliminary indications of interest regarding a potential segment acquisition from Party A and parties referred to in the Proxy as "Party G," "Party J," "Party K," and "Party L."

9

45.     At a March 24, 2017 Board meeting, Centerview reported that there were three active bidders remaining: Apollo was still interested in a whole-company acquisition and Party H and Party L were each interested in a potential segment acquisition related to the Company's non-Unified Communications Services segments.

46.     On April 13, 2017, Apollo submitted a non-binding bid for a potential whole-company acquisition for $23.00 per share in cash with a prohibition on dividends after signing of the merger agreement.  Party H submitted a non-binding bid for a possible acquisition of 100% of the non-unified communications services segments for between $2.4 billion and $2.6 billion in cash.  Party L submitted a non-binding bid for a possible acquisition of 100% of the Interactive Services and Safety Services segments and certain assets within the Specialized Agent Services segment for $2.36 billion in cash.

47.     On April 17, 2017, the Board held a meeting to review the three proposals, noting, among other things, that Apollo had requested a period of exclusivity as well as voting agreements from each of THL, Quadrangle and Mr. and Mrs. Gary and Mary West, who collectively control approximately 45% of the voting power of West common stock.

48.     On April 19, 2017, Apollo increased the price of its proposal to $23.50 per share in cash and continued to insist that the definitive merger agreement include, among other things, a prohibition against payment of any cash dividends.

49.     At an April 27, 2017 Board meeting, the Board determined to cease further discussions with Party H and Party L.  Following this meeting, West, Apollo, and their advisors continued to negotiate the remaining terms of the merger agreement.

50.     At a May 7, 2017 Board meeting, the Board reviewed the progress of negotiations with Apollo and discussions with Mr. and Mrs. West, including their decision to agree to Apollo's

10

price of $23.50 per share and no payment of dividends.  In connection with the Board's decision to authorize management to discuss post-closing management compensation and arrangements with Apollo, defendant DiNovi noted that THL and Quadrangle would be willing to provide between $3 million and $5 million (in the aggregate) of their proceeds from the transaction to fund an additional retention plan for the Company's senior management, payable at the closing of the transaction.  The Board determined to defer discussions until after the signing of the Merger Agreement.[1]  The Proxy fails to disclose the circumstances and interests that prompted THL and Quadrangle to propose funding an additional retention plan.

51.     On May 9, 2017, Centerview rendered its oral opinion to the Board.  The Board approved the Merger Agreement and that evening, West and Apollo executed the Merger Agreement and related transaction documents.

**The Proposed Transaction**

52.     On May 9, 2017, West issued a press release announcing entry into the Merger Agreement, which stated in relevant part:

> OMAHA, Neb., May 09, 2017 -- West Corporation (Nasdaq:WSTC) (the "Company" or "West"), a global provider of communication and network infrastructure services, today announced it has entered into a definitive agreement with affiliates of certain funds managed by affiliates of Apollo Global Management, LLC (the "Apollo funds") (together with its consolidated subsidiaries, "Apollo") (NYSE:APO), a leading global alternative investment manager, pursuant to which the Apollo funds will acquire all of the outstanding shares of West common stock for $23.50 per share in cash.

> The purchase price represents a premium of approximately 17.5 percent over West's closing stock price on November 1, 2016, the last trading day prior to the announcement that the Company initiated a process to explore strategic and financial alternatives. The proposed transaction has an enterprise value of approximately $5.1 billion, including net debt.

---

[1]  The additional retention plan was ultimately not adopted as Apollo failed to provide the requisite consent.

The West Board of Directors has unanimously approved the agreement with the Apollo funds and recommends that West stockholders vote in favor of the proposed transaction. Certain West stockholders, including Thomas H. Lee Partners, L.P., Quadrangle Group LLC, Gary L. West and Mary E. West, who in the aggregate beneficially own approximately 45 percent of West's outstanding common stock, have committed to vote in favor of the proposed transaction, subject to certain customary conditions, at a special meeting of West stockholders.

* * *

"We are extremely excited for our funds to acquire West," said Matthew Nord, Senior Partner at Apollo. "West is the leader in global conferencing and collaboration services, and is well-positioned to capitalize on customer migration to cloud-based solutions and continue to grow its Safety Services, Interactive Services and Health Advocate Solutions businesses. We look forward to working with West's talented and dedicated team to continue the strong heritage of providing the highest-level of service and care to its customers."

**Transaction Details**

The transaction is expected to close in the second half of the year. The transaction is subject to receipt of certain regulatory approvals, including expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act, approval by the U.S. Federal Communications Commission and certain state and foreign regulatory approvals, as well as West stockholder approval and other customary closing conditions. Following the transaction West will become a privately held company and shares of West's common stock will no longer be listed on any public market.

**Insiders' Interest in the Proposed Transaction**

53.     Apollo and West insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of West.

54.     Notably, it appears that members of Company management have secured positions for themselves following completion of the Proposed Transaction.  In West's May 9, 2017 press release announcing the Proposed Transaction, defendant Barker states, "[w]e look forward to working closely with Apollo as we continue to grow and strengthen our business."  Apollo's Senior

Partner Matthew Nord is also quoted as saying, "[w]e look forward to working with West's talented and dedicated team to continue the strong heritage of providing the highest-level of service and care to its customers."

55.    Further, Company insiders stand to reap a substantial financial windfall for securing the deal with Apollo.  Pursuant to the Merger Agreement, each option, stock unit award and restricted stock award will be converted into the right to receive cash payments.  The following tables set forth the cash payments West's executive officers stand to receive in connection with their vested and unvested equity awards, respectively:

| Executive Officers | Number of Vested Stock Options (#) (1) | Value of Vested Stock Options ($) (1) | Number of Notional Shares in Deferred Compensation Plan (#) (2) | Value of Notional Shares in Deferred Compensation Plan ($) (2) | Estimated Total Consideration ($) |
|---|---|---|---|---|---|
| Thomas B. Barker* | 770,624 | — | 395,113 | 9,285,156 | 9,285,156 |
| Ronald R. Beaumont | 53,749 | 20,700 | — | — | 20,700 |
| Nancee R. Berger | 125,000 | — | 370,228 | 8,700,358 | 8,700,358 |
| J. Scott Etzler | 88,750 | 15,525 | 88,415 | 2,077,753 | 2,093,278 |
| Jon R. Hanson | 62,500 | — | 37,800 | 888,300 | 888,300 |
| Rod J. Kempkes | 31,250 | — | 94,982 | 2,232,077 | 2,232,077 |
| Jan D. Madsen | — | — | 47,766 | 1,122,501 | 1,122,501 |
| David C. Mussman | 100,000 | — | 148,242 | 3,483,687 | 3,483,687 |
| Nicole B. Theophilus | — | — | 277 | 6,510 | 6,510 |
| David J. Treinen | 100,000 | — | 144,095 | 3,386,233 | 3,386,233 |

| Executive Officers | Number of Stock Units and Restricted Stock Awards (#) (1) | Value of Stock Units and Restricted Stock ($) (1) | Number of Unvested Stock Options (#) (2) | Value of Unvested Stock Options ($) (2) | Number of Notional Shares in Deferred Compensation Plan (#) (3) | Value of Notional Shares in Deferred Compensation Plan ($) (3) | Estimated Total Consideration ($) |
|---|---|---|---|---|---|---|---|
| Thomas B. Barker* | 450,000 | 11,587,500 | — | — | — | — | 11,587,500 |
| Ronald R. Beaumont | 93,200 | 2,297,075 | 10,000 | 6,900 | — | — | 2,303,975 |
| Nancee R. Berger | 141,350 | 3,452,225 | — | — | — | — | 3,452,225 |
| J. Scott Etzler | 139,750 | 3,444,438 | 7,500 | 5,175 | — | — | 3,449,613 |
| Jon R. Hanson | 93,200 | 2,297,075 | — | — | — | — | 2,297,075 |
| Rod J. Kempkes | 93,200 | 2,297,075 | — | — | — | — | 2,297,075 |
| Jan D. Madsen | 121,000 | 2,976,391 | — | — | 11,941 | 280,614 | 3,257,005 |
| David C. Mussman | 122,250 | 3,006,469 | — | — | — | — | 3,006,469 |
| Nicole B. Theophilus | 45,700 | 1,094,200 | — | — | 138 | 3,243 | 1,097,443 |
| David J. Treinen | 139,700 | 3,443,263 | — | — | — | — | 3,443,263 |

56.     Moreover, if they are terminated in connection with the merger, West's named executive officers will receive substantial severance benefits, including cash payments, in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash (2) | Equity (3) | Pension/ NQDC (4) | Perquisites/ Benefits (5) | Tax Reimbursement (6) | Other | Total |
|---|---|---|---|---|---|---|---|
| Thomas B. Barker<br>*Chief Executive Officer* | 7,561,476 | 11,587,500 | — | 23,554 | — | 15,000 | 19,187,530 |
| Ronald R. Beaumont<br>*President—Telecom Services and President— Safety Services* | 1,649,649 | 2,303,975 | — | 7,849 | — | 15,000 | 3,976,473 |
| Nancee R. Berger<br>*President and Chief Operating Officer* | 3,592,504 | 3,452,225 | — | 44,121 | — | 15,000 | 7,103,850 |
| J. Scott Etzler<br>*President—Unified Communications Services and President—Revenue Generation* | 1,997,534 | 3,449,613 | — | 7,069 | — | 15,000 | 5,469,216 |
| Jan D. Madsen<br>*Chief Financial Officer* | 1,790,630 | 2,976,391 | 280,614 | 9,880 | — | 15,000 | 5,072,515 |

## The Proxy Contains Material Misstatements or Omissions

57.     The defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to West's stockholders.   The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

58.     Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) West's financial projections, relied upon by West's financial advisor, Centerview; (ii) the valuation analyses prepared by Centerview in connection with the rendering of its fairness opinion; and (iii) the background of the Proposed Transaction, including potential conflicts of interest. Accordingly, West stockholders are being asked to vote for the Proposed Transaction or exercise their appraisal rights without all material information at their disposal.

14

***Material Omissions Concerning West's Financial Projections***

59.     The Proxy fails to disclose material information relating to the Company's financial projections relied upon by Centerview for its analyses.

60.     For example, with respect to the West management projections, the Proxy discloses projections for various non-GAAP metrics including Adjusted EBITDA and Unlevered Free Cash Flow, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP.  The omission of the aforementioned line item projections renders the non-GAAP projections included in the Proxy materially misleading and incomplete.

61.     The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged.  The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information.  Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two. Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

62.     In addition, the Proxy omits the Company's management projections for the following items: (i) taxes (or tax rate); (ii) capital expenditures; (iii) changes in net working capital; (iv) stock-based compensation expense; (v) EBITDA; (vi) interest expense; (vii) non-recurring items; (viii) depreciation and amortization; (ix) earnings; and (x) net operating profit.

63.     Further, the Proxy sets forth that at the November 15, 2016 Board meeting, Treinen "discussed with the Board an overview of (i) management's updated five-year financial projections and a comparison of such revised five-year financial projections to the preliminary five-year projections previously discussed with the Board on July 27, 2016."  Proxy at 31. However, the Proxy fails to disclose (i) the version of projections discussed with the Board on July 27, 2016; (ii) the details of management's revisions to the previous version of projections; and (iii) whether Centerview had any role in providing the assumption and inputs to the revised five-year financial projections.

64.     The omission of this information renders the statements in the "Forward-Looking Financial Information" section of the Proxy false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Centerview's Financial Analyses***

65.     The Proxy describes Centerview's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Centerview's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, West's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Centerview's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to West's stockholders.

66.     With respect to Centerview's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the individual inputs and assumptions utilized by Centerview to derive the discount rate range of 8.5%-9.5%; (ii) the range of terminal values of West; (iii) Centerview's basis for

applying perpetuity growth rates ranging from 1.0% to 2.0%; and (iv) the net debt of the Company as of March 31, 2017 utilized by Centerview in the analysis.

67.     With respect to Centerview's *Selected Public Company Analysis*, the Proxy fails to disclose any benchmarking analyses Centerview performed for West in relation to the selected companies as well as how the following statement influenced Centerview's opinion: "Centerview also observed that the Company consistently traded at a significant discount to the median of the enterprise value / estimated next twelve months Adjusted EBITDA multiple for the selected companies over the prior three years."  Proxy at 52.

68.     With respect to Centerview's *Selected Transactions Analysis*, the Proxy fails to disclose any benchmarking analyses Centerview performed for West in relation to the target companies.

69.     The omission of this information renders the statements in the "Summary of Centerview Financial Analysis" section of the Proxy false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process***

70.     The Proxy also fails to disclose or misstates material information relating to the background process leading up to the Proposed Transaction.

71.     For example, in the Company's May 9, 2017 press release announcing the Merger Agreement, defendant Barker stated, in part, "[w]e look forward to working closely with Apollo as we continue to grow and strengthen our business."  Similarly, Apollo Senior Partner Matthew Nord was quoted as stating "[w]e look forward to working with West's talented and dedicated team to continue the strong heritage of providing the highest-level of service and care to its customers."  The Proxy sets forth that on November 26, 2016, "[t]he Board determined that

17

management would not be permitted to engage in any discussions with any potential buyer regarding post-closing compensation and employment arrangements unless authorized by the Board" and that "notwithstanding the Board's authorization of such discussions at the conclusion of its [May 7, 2017] meeting, the management team had not had any discussions with Apollo regarding any plans for post-closing management compensation and arrangements." Proxy at 31, 40. However, the Proxy fails to disclose whether any of Apollo's prior proposals or indications of interest mentioned management retention or the potential for Board members to sit on the combined company's board of directors.

72.    Additionally, according to the Proxy, at the May 7, 2017 Board meeting, defendant DiNovi "noted that THL and Quadrangle would be willing to provide between $3 million and $5 million (in the aggregate) of their proceeds from the transaction to fund an additional retention plan for the Company's senior management, payable at the closing of the transaction." Yet the Proxy fails to disclose the circumstances and interests that prompted THL and Quadrangle to make this proposal.

73.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

74.    In addition, although the Proxy sets forth certain information regarding the standstill provisions included in the confidentiality agreements the Company entered into with parties after November 16, 2016, the Proxy fails to disclose any information concerning the confidentiality and standstill agreement previously executed by the Company. Specifically, the

18

Proxy fails to disclose the details of the confidentiality and standstill agreements the Company entered into with Party A, Party B and Party E, including whether the standstill provisions are "don't ask, don't waive" provisions currently precluding these parties from making a topping bid. The Proxy similarly fails to disclose whether the confidentiality agreement the Company entered into with Party D contained a "don't ask, don't waive" standstill provision that is currently precluding Party D from making a topping bid.

75.     The Proxy also fails to disclose any terms of Party A's January 20, 2016 indication of interest as well as the Company's basis for "prioritizing parties interested in a Potential Whole-Company Acquisition." Proxy at 33.

76.     The omission of this information renders the statements in the "Interests of Directors and Executive Officers in the Merger" and "Background of the Merger" sections of the Proxy false and/or materially misleading in contravention of the Exchange Act.

77.     Defendants' failure to provide West stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision on the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act
And SEC Rule 14a-9 Promulgated Thereunder**

78.     Plaintiff repeats all previous allegations as if set forth in full.

79.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

80.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

81.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the defendants.   The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the financial analyses performed by the Company's financial advisor, and the actual intrinsic standalone value of the Company.  The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

20

82.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

83.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

85.     Plaintiff repeats all previous allegations as if set forth in full.

86.     The Individual Defendants acted as controlling persons of West within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of West and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

89.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of West, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to West stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated:  June 28, 2017                                 STEPHEN BUSHANSKY, On Behalf of Himself
                                                                    and All Others Similarly Situated, Plaintiff


                                            By:   *s/ David W. Rowe*
                                                      David W. Rowe – 19155
                                                      **KINSEY ROWE BECKER & KISTLER, LLP**
                                                      3800 VerMaas Place, Suite 100
                                                      Lincoln, NE 68502
                                                      Telephone: 402.434.9050
                                                      Facsimile: 402.438.1654
                                                      drowe@krbklaw.com

                                                      Local Counsel for Plaintiff

**OF COUNSEL**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*